UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**PETER W.,**[1]

    **Plaintiff,**

  v.                                Civil Action 2:23-cv-624
                                        Magistrate Judge Chelsey M. Vascura

**COMMISSIONER OF SOCIAL
SECURITY,**

    **Defendant.**

## OPINION AND ORDER

      Plaintiff, Peter W. ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Period of Disability, Disability Insurance Benefits, and Supplemental Security Income benefits. This matter, in which the parties have consented to the jurisdiction of the Magistrate Judge pursuant to 28 U.S.C. § 636(c), is before the undersigned for a ruling on Plaintiff's Statement of Specific Errors (ECF No. 10), the Acting Commissioner's Memorandum in Opposition (ECF No. 11), Plaintiff's Reply (ECF No. 12), and the administrative record (ECF No. 9). For the reasons that follow, Plaintiff's Statement of Specific Errors is **OVERRULED,** and the Commissioner's decision is **AFFIRMED**.

---

[1] Pursuant to this Court's General Order 22-01, any opinion, order, judgment, or other disposition in Social Security cases shall refer to plaintiffs by their first names and last initials.

## I. BACKGROUND

Plaintiff protectively filed his application for Title II period of disability and disability insurance and an application for Title XVI supplemental security income benefits on September 25, 2020, alleging that he became disabled beginning November 11, 2016. Plaintiff later amended his alleged onset date to be December 14, 2019, which was after a prior unfavorable Administrative Law Judge ("ALJ") determination dated December 13, 2019. After Plaintiff's applications were denied at the initial and reconsideration levels, an ALJ held an online video hearing on January 27, 2022, and issued an unfavorable determination on April 7, 2022. That unfavorable determination became final on December 13, 2022, when the Appeals Council denied Plaintiff's request for review.

Plaintiff seeks judicial review of that December 13, 2022, final determination. Plaintiff asserts two main contentions of error: (1) the ALJ erred in not finding that Plaintiff's migraine headaches medically equaled listing 11.02; and (2) the ALJ erred in failing by failing to properly apply SSR 16-3p and finding that Plaintiff could engage in substantial gainful employment on a full-time and sustained basis. (Pl's Statement of Specific Errors 10–19, ECF No. 10.) The undersigned disagrees**.**

## II. THE ALJ'S DECISION

On April 7, 2022, the ALJ issued her decision. The ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2021, (R. 20), and found that Plaintiff had not been disabled within the meaning of the Social Security Act from the amended alleged onset date of December 14, 2019, through the date of the decision. (*Id*. at 33.)

At step one of the sequential evaluation process,[2] the ALJ found that Plaintiff had not engaged in substantially gainful activity since December 14, 2019. (*Id.* at 20.) At step two, the ALJ found that Plaintiff had the following severe impairments: morbid obesity, migraine headaches, cellulitis, lymphedema, meralgia paresthetica, degenerative disc disease of the spine; osteoarthritis of both knees, and depressive disorder. (*Id.*) The ALJ also found that Plaintiff had the following non-severe impairments: gastroesophageal reflux disease ("GERD") and insomnia. (*Id.* at 20–21.) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 21–25.) The ALJ then set forth Plaintiff's residual functional capacity ("RFC") as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant can only occasionally operate foot controls with his feet bilaterally. The claimant can occasionally reach overhead with his upper extremities bilaterally. He can engage in frequent handling, fingering, and feeling with the bilateral upper extremities. The claimant can never

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

> climb ladders, ropes or scaffolds and can only occasionally climb ramps or stairs. The claimant can occasionally stoop, kneel, or crouch but must avoid crawling. The claimant can never work at unprotected heights and can never operate a motor vehicle. He must also avoid hazards including moving machinery and heavy machinery. The claimant can tolerate moderate noise levels. When seated, he will require the use of a foot stool 3-6 inches high. The claimant is limited to semi-skilled work. Furthermore, the claimant would be capable of occasional interaction with supervisors, co-workers, or the general public and could handle occasional changes in a static work environment.

(*Id.* at 25.) The ALJ then determined at step four that Plaintiff was unable to perform any past relevant work as an order clerk. (*Id.* at 31.) At step five, the ALJ, relying upon a vocational expert, found that jobs existed in significant numbers in the national economy that an individual with Plaintiff's age, education, work experience, and residual functional capacity would have been able to perform, with representative occupations being information document preparer, table worker and film touch-up screener. (*Id.* at 32–33.) The ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act during the relevant period. (*Id.* at 33.)

### III.   STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm a decision by the Commissioner as long as it is supported by substantial evidence and was made pursuant to proper legal standards." *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014) (cleaned up); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). While this standard "requires more than a mere scintilla of evidence, substantial evidence means only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moats v. Comm'r of Soc. Sec.*, 42 F.4th 558, 561 (6th Cir. 2022) (cleaned up) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "examine[ ] the record as a whole and take[ ] into account whatever in the record fairly detracts

from the weight" of the Commissioner's decision. *Golden Living Ctr. v. Sec'y of Health & Human Servs.*, 656 F.3d 421, 425 (6th Cir. 2011) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, where "substantial evidence supports the Secretary's determination, it is conclusive, even if substantial evidence also supports the opposite conclusion." *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 849 (6th Cir. 2020) (quoting *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir. 1990)). Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers v. Comm'r Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## IV. ANALYSIS

**A. The ALJ did not err in concluding that Plaintiff's headaches did not meet or medically equal listing 11.02B.**

As set forth above, Plaintiff first argues that ALJ erred when she did not properly consider Plaintiff's migraine headaches under SSR 19-4p at step three and her headaches met the requirements of Listing 11.02B.

In determining whether a claimant is disabled, an ALJ must consider whether the claimant's impairments meet Social Security Listing requirements. 20 C.F.R. §§ 404.1520(a)(4)(iii); 416.920(a)(4)(iii). If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded. 20 C.F.R. §§ 404.1520(d); 416.920(d). Plaintiff bears the burden of proof at steps one through four of the five-step analysis. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999) ('[I]t is not unfair to require a claimant to prove the extent of his impairments.") (*citing Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). A claimant's impairment must meet *every element* of a Listing

5

before the Commissioner may conclude that he or she is disabled. *See Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria.") (emphasis in original). The claimant shoulders the burden of producing medical evidence that establishes that all elements are satisfied. It is not sufficient to come to close to meeting the conditions of a Listing. *See, e.g.*, *Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir. 1989) (Commissioner's decision affirmed where medical evidence "almost establishes a disability" under Listing).

Migraine headaches are not themselves a listed impairment. As the ALJ correctly explained, "[u]nder SSR-19-4p, which was considered throughout the decision, the claimant's primary headache disorder is not a listed impairment . . . ; however, we may find that a primary headache disorder, alone or in combination with another impairment(s), medically equals a listing." (R. 21.) SSR 19-4 provides that "Epilepsy (listing 11.02) is the most closely analogous listed impairment for an MDI of a primary headache disorder. While uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and we may find that his or her MDI(s) medically equals the listing." SSR 19-4p, 2019 WL 4169635, at *7 (2019). The ALJ specifically noted that she considered both SSR 19-4p and the 11.0 listings, but she determined that "not all criteria of any particular listings can be supported by the record." (R. 22.)

Plaintiff argues that his headaches meet listing 11.02B. (Pls Statement of Specific Errors 10–11.) Listing 11.02B describes dyscognitive seizures "occurring at least once a week for at least 3 consecutive months . . . despite adherence to prescribed treatment." 20 C.F.R. Part 404, Subpart P, App.1, § 11.02B (internal citations omitted). In deciding whether a claimant's

migraines are equal in severity and duration to the criteria in 11.02B, an ALJ may also consider the following additional factors:

> [a] detailed description from an [acceptable medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

SSR 19-4p, 2019 WL 4169635, at *7.

Plaintiff's history of migraines began before the alleged disability onset date, and after the alleged onset date, the medical records show sporadic references to and treatment for migraines, mixed with records in which Plaintiff denied headaches. On September 13, 2019, Plaintiff saw Dr. David Klein for migraines. (R. 348.) The notes from that visit report: "[Plaintiff] has had a migraine for the past 10 days. Het (sic) has nausea and dizziness with it. The Imitrex helps. He is photophobic." (*Id.*) His medications were not changed at that visit, and he was instructed to return in three months for follow-up. (*Id.* at 350.) Plaintiff's alleged disability period begins on December 14, 2019, and December 20, 2019, Plaintiff was again seen by Dr. Klein complaining of back pain and migraines. He was prescribed Imitrex, one tablet by mouth every two hours as needed for migraine and advised to return in three months. There are no details as to the frequency or severity of Plaintiff's migraines provided. (*Id.* at 351–52.) On February 1, 2020, Plaintiff was seen by Jessilyn Secrest, RN, for an evaluation of numbness in his hands. (*Id.* at 363–64.) Although "Migraine syndrome" "9/13/2019 – Present" is noted in a list of Plaintiff's medical problems, the record of this visit is otherwise silent as to headaches. (*Id.*.) On February 25, 2020, Plaintiff had a medical visit for left knee pain. The note's "Patient

7

Active Problem List" identifies "Migraine syndrome" with "Date Noted 9/13/2019," but the record of this visit is otherwise silent as to headaches. (*Id.* at 299–300.) On August 25, 2020, Plaintiff had a telehealth visit for back and shoulder pain. The "Review of Systems" notes "Negative for headaches." (*Id.* at 359–60.) October 2, 2020, in the "Disability Report – Adult – Form SSA-3368" completed after Plaintiff filed for benefits, Plaintiff did not include migraines or headaches when asked to list "all of the physical or mental conditions . . . that limit your ability to work." (*Id.* at 236.) On May 9, 2021, Plaintiff had a consultative examination by Louis DeCola, Ph.D. "According to [Plaintiff], his chief complaint consists of 'Lymphedema, depression.'" Plaintiff also reported that "[h]e suffers headaches 1-2 times a week for 2-4 hours." There are no further details regarding his headaches. (*Id.* at 413.) On June 18, 2021, Plaintiff had a telehealth visit complaining of depressed mood. In the record's "Review of Symptoms" it was noted "[n]egative for dizziness and headaches." (*Id.* at 428–29.) On September 22, 2021, Plaintiff was evaluated for ADHD, the note reports that Plaintiff "is prescribed propranolol and says that it is for migraine headaches" but also reports that "Patient denied any headaches and dizziness." (*Id.* at 440–41.) On October 20, 2021, Plaintiff had telehealth visit for complaints of "depression, fatigue and sleep disturbance." The notes reflect that "Patient denied any headaches or dizziness." (*Id.* at 444.) Thus, through October 2021, the record contains no evidence demonstrating that Plaintiff had headaches of a severity to medically equal a dyscognitive seizure at least once a week for three months.

    The medical records and testimony from November 2021 through January 2022, though arguably closer, likewise fall short in establishing the frequency and durational requirements under Listing 11.02B. On November 3, 2021, Plaintiff had a telehealth visit with Tashia Adkins-Sharrer, APRN. The notes of that visit report that "[Plaintiff] . . . presents for follow-up related to

headaches (chronic) and wounds on legs. Symptoms started a few weeks ago and are ongoing. States his headaches have been ok. Has not been getting them as frequently. Reports Imitrex does help, but usually needs a few doses. States he usually has a bad headache about once per week." (*Id.* at 448.) Plaintiff was again prescribed Imitrex and instructed to return in about 6 weeks (around 12/15/2021) for headache." (*Id.* at 49.) Plaintiff returned for a follow-up visit on December 15, 2021. The notes from that visit state: "Patient reports that he is having headaches one every couple of days and feels that a lot of this is weather related. He voices that Imitrex is helping with the headaches and denies any side effects. Patient voices no other concerns at this time." (*Id.* at 545.) Plaintiff was instructed to "[r]eturn in about 3 months . . . for headache." (*Id.* at 454.) On January 13, 2022, Plaintiff's fiancé prepared a Function Report on behalf of Plaintiff. (*Id.* at 285–92) In response to the question "How does the person's illnesses, injuries, or conditions limit his/her ability to work?," she described Plaintiff's problems caring for his legs and need to put his feet up multiple times during the day, but she but does not mention headaches. (*Id.*) At the January 27, 2022 hearing before the ALJ, Plaintiff testified about his headaches that "it's been a really rough time the past month or two" and reported his symptoms included photosensitivity, dizziness, lightheadedness, and extreme pain usually behind his eyes. (*Id.* at 54–55.) He stated that he saves his Imitrex pills for when his headaches are really bad, and usually takes nine pills per month, taking one or two depending upon the severity of his migraines. (*Id.* at 55.) The Imitrex lessons the severity of the migraines. (*Id.*).  In November 2021, he stated that his headaches had been okay and he had not been getting them as frequently, "usually" around once a week. In January 2022, he testified that only "the past month or two" had been bad, and he attributed his increased headache symptoms in December as resulting from the weather.

9

Plaintiff has also fallen short of showing that the ALJ erred in determining that Plaintiff's migraines did not meet Listing 11.02B's severity requirements. Plaintiff notes that "[a]ccording to the ALJ, Plaintiff had migraine headaches with nausea, dizziness, and photophobia for ten days but they improved with Imitrex." (Pl's Statement of Specific Errors 10, ECF No. 10.) But the ALJ specifically noted that Plaintiff's complaint of migraines with "nausea, dizziness and photophobia for ten days" was "*[p]rior* to the alleged onset date." (R. 27 (citing R. 348) (emphasis added).) After the alleged onset date of December 14, 2019, the record is bereft of any "description from an [acceptable medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms)," SSR 19-4p. Further, the ALJ cited to treatment notes from November and December 2021 that support her finding that Plaintiff responded well to treatment with Imitex such that his headaches were "under good control" while reporting no medication side effects. (*Id.* at 27.) The ALJ also found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record." (*Id.* at 25.) In further support of her finding that Plaintiff's migraines were under control and that Plaintiff was responding well to treatment, the ALJ observed that Plaintiff "is able to spend hours playing videogames despite his migraine headaches." (*Id.* at 27.) The ALJ pointed out that "the record reveals that videogames are the claimant's main daily activity and that he reported spending up to ten hours a day doing so." (*Id.* at 26.) (*See also id.* at 414 (noting that Plaintiff reported that "[h]e watches television for between 2-4 hours a day. He plays games and reads at least one article on the internet for 10 hours on the average each day"); 285, 438, 450, 464, 473 (all noting Plaintiff's online activity and playing of video games). Significantly, although she determined that Plaintiff's headaches

10

did not medically equal Listing 11.02B, the ALJ took them into account in determining Plaintiff's RFC. (*Id.* at 27.)

At the end of his argument that the ALJ erred at step three when determining whether his headaches met Listing 11.02B, Plaintiff posits that the ALJ failed to properly apply SSR 19-2P and to "account for the combination of [Plaintiff's] obesity and related impairments." (Pl's Statement of Specific Errors 12, ECF no. 10.) As SSR 19-2P explains, "[o]besity is not a listed impairment; however, the functional limitations caused by the MDI of obesity, alone or in combination with another impairment(s), may medically equal a listing." SSR 19-2P, 2019 WL 2374244, at *3. Plaintiff does not identify any Listing, other than Listing 11.02B, that he believes he meets. He does not discuss whether his obesity—either alone or in combination with his other impairments—satisfies a Listing. Moreover, the ALJ noted that "where impairments have no particular listing, *they were considered in combination with all other impairments and with regard to all possible listings.*" (R. 22.) "An ALJ's individual discussion of multiple impairments does not imply that he failed to consider the effect of the impairments in combination, where the ALJ specifically refers to a 'combination of impairments' in finding that the plaintiff does not meet the listings." *Loy v. Sec'y of Health & Hum. Servs.*, 901 F.2d 1306, 1310 (6th Cir. 1990) (quoting *Gooch v. Sec'y of Health & Hum. Servs.*, 833 F.2d 589, 592 (6th Cir. 1987), *cert denied*, 484 U.S. 1075 (1988)). Regardless, in her step-three analysis, the ALJ expressly took SSR 19-2P into consideration, explaining that "obesity may increase the risk of severity of a coexisting or related impairment(s) to the extent that the combination or impairments medically equals a listing." (R. 22.) Although the ALJ found that Plaintiff had not met any Listing, she explained that "[c]onsiderations of [Plaintiff's] obesity have been taken into account in reaching

11

the conclusions herein at the second through fifth steps of the sequential disability evaluation process." (*Id.*)

In summary, because the ALJ did not err in her step-three determination, Plaintiff's first contention of error lacks merit.

**B.** **Substantial supports the ALJ's RFC determination that Plaintiff could perform a reduced range of sedentary work.**

Plaintiff's second contention of error, that the ALJ failed to properly apply SSR 16-3P and incorrectly found that Plaintiff could engage in substantial gainful activity on a full-time and sustained basis, likewise lacks merit.

A claimant's RFC is an assessment of "the most [he] can still do despite [his] limitations" "on a regular and continuing basis." 20 C.F.R. §§ 404.1545(a)(1), (b)–(c); 416.945(a)(1), (b)–(c). The determination of a claimant's RFC is an issue reserved to the Commissioner. *See* 20 C.F.R. §§ 404.1546(c); 416.946(c) ("the administrative law judge . . . is responsible for assessing your residual functional capacity"). Nevertheless, substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue*, No. 1:09-cv-411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010) (citing *Kirk v. Sec'y of Health & Hum. Servs.*, 667 F.2d 524, 535 (6th Cir. 1981)). The Social Security Act and agency regulations require an ALJ to determine a claimant's RFC based on the evidence as a whole. 42 U.S.C. §§ 423(d)(5)(B). Consistently, Social Security Ruling 96-8p instructs that the ALJ's RFC assessment must be based on all of the relevant evidence in the case record, including factors such as medical history, medical signs and laboratory findings, the effects of treatment, daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms, and evidence from attempts to work. SSR 96-8P, 1996 WL 374184 (July 2, 1996). An ALJ must explain how the evidence supports the limitations that he or she sets forth in the claimant's RFC.

12

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g.*, laboratory findings) and nonmedical evidence (*e.g.*, daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

*Id.* at *7.

SSR 16-3p provides that the ALJ's "determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304, at *10. An ALJ must "consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and . . . evaluate whether the statements are consistent with objective medical evidence and the other evidence." *Snyder v. Comm'r of Soc. Sec.*, 2023 WL 3673265, at *5 (6th Cir. May 26, 2023) (quoting SSR 16-3p, 2016 WL 1119029, at *6 (Mar. 16, 2016)). The Regulations list a variety of factors an ALJ must consider in evaluating the severity of symptoms, including a claimant's daily activities; the location, duration, frequency and intensity of pain; factors that precipitate or aggravate symptoms; the effectiveness and side effects of medications; treatments other than medication; and any measures used to relieve pain or other symptoms. 20 C.F.R. §§ 404.1529(c)(3); 416.929(c)(3).

Plaintiff identifies a variety of different impairments and symptoms in arguing that the ALJ's RFC failed to consider the totality of the evidence in determining his RFC. But a review of the record together with the ALJ's decision makes clear that the ALJ considered Plaintiff's symptoms and impairments both singularly and in combination when crafting his RFC. Plaintiff

13

noted that he had been diagnosed with carpal tunnel syndrome. (Pl's Statement of Specific Errors 4, 13 & 16, ECF No. 10.) Plaintiff had a positive Phalen's in both wrists on December 20, 2019 (R. 352), and exhibited mild bilateral carpal tunnel syndrome on February 1, 2020. (*Id.* at 364.) In her report, the ALJ explained that Plaintiff's carpal tunnel syndrome was mild and that the record contains no evidence reflecting that Plaintiff ever requested or received treatment for carpal tunnel. (*Id.* at 27.) The ALJ further observed that "[Plaintiff] has reported many hours of gaming during the day and night suggesting that his carpal tunnel syndrome symptoms are tolerable enough to continue to engage in this activity. (*Id.*) Significantly, the ALJ took Plaintiff's carpal tunnel into account when determining his RFC, explaining "[Plaintiff] has been provided residual functional capacity limitations including only frequent handling, fingering, feeling with the bilateral upper extremities." (*Id.* at 27–28.)

The ALJ also found that Plaintiff suffered from the severe impairment of osteoarthritis in both knees. (*Id.* at 20.) Plaintiff had been treated for left knee sprain and chondromalacia of his left patella on January 13, 2020. (*Id.* at 296). The ALJ noted that on February 25, 2020, "Plaintiff reported pain in his left knee down to a 2 out of 10 . . . . He was to return if he wanted additional treatment for symptoms (B1F) but he did not return for quite a while, suggestive of sustained improvement (B4F)." (*Id.* at 27.) The ALJ also noted that on August 25, 2020, Plaintiff complained of should and back pain, but did not report knee pain. (*Id.*). The ALJ wrote that "[Plaintiff] next presented with an onset of right knee pain and a right knee blister on [December 4, 2020], and no left knee symptoms. He had mild redness and healing blister but no other abnormal knee finding." (*Id.*) Based upon a review of the medical evidence, the ALJ concluded that "Plaintiff has had minimal treatment for his knees with documented improvement." (*Id.*)

14

The ALJ also found that Plaintiff had the severe impairment of lymphedema (*id.* at 20), and the ALJ carefully reviewed Plaintiff's testimony and the medical records regarding his lymphedema in her RFC determination. Plaintiff testified that his leg swelling varied between getting worse and staying the same (*id.* at 47), that he had open sores on his legs (*id.*), and that he was elevating his feet equal to or higher than his heart for 15 minutes every hour in an ergonomic bed for his lyphedema. (*Id.* at 45.) The ALJ noted that Plaintiff had also testified that more often than not, he is able to play videogames all day with standard work breaks of fifteen minutes every two or three hours. (*Id.* at 26; 49) Plaintiff also testified that when he plays videogames, he uses a footrest and leans back in his chair. (*Id.* at 53.) The medical records show that on April 9, 2021, Plaintiff was noted to have an increase in leg swelling "likely related to the diclofenac" that he had been taking for his degenerative disc disease. (*Id.* at 423.) Plaintiff was given a refill for a prescription of Lasix, and on May 7, 2021, he reported that "Lasix has helped with leg swelling." (*Id.* at 425.) With regard to his leg sores, on December 4, 2020, Plaintiff developed cellulitis on his lower right leg, and was treated with Keflex and ointments. (*Id.* at 36.) On October 20, 2021, Plaintiff "denied any rashes or nonhealing lesions" on his skin. (*Id.* at 444.) On November 3, 2021, he was seen for wounds on his legs, and reported that "he has been using OTC creams and they are healing okay, but slowly." (*Id.* at 444.) The ALJ concluded as follows: "[T]he record reflects little documentation of lymphedema or limitations as a result, noncompliance with treatment, and inconsistent activities of daily living and the claimant's own testimony supporting tolerable symptoms with lower elevation on a small step stool all day while playing games on the computer or reading on the computer. There were few occurrences of lymphedema and those responded to treatment." (*Id.* at 26.) The ALJ further explained that "[Plaintiff] is not elevating his legs above his heart and the record does not support a medical

need to elevate his leg above his heart level 15 minutes every hour, the reason he cited in testimony for his alleged inability to work and has reported as the basis for his disability applications." (*Id.*) Plaintiff asserts that the ALJ erred when considering his testimony regarding his playing videogames and elevating his legs, explaining that when he plays videogames, he leans back in his chair, but to do anything else on the computer, he would have to lean forward. (Pl's Statement of Specific Errors 6, ECF No. 10.) However, Plaintiff does not dispute that he is not elevating his feet above his heart while playing videogames, nor does Plaintiff point to medical records showing a need to elevate his legs above his heart 15 minutes every hour.

With regard to Plaintiff's complaints of knee pain, lymphedema and leg sores, in assessing Plaintiff's RFC, the ALJ concluded:

> Overall, the claimant's treatment history for these impairments include rare complaints, large gaps and evidence of improvement with conservative care, and is not consistent with the extent of limitations alleged in disability reports. Thus, the residual functional capacity reflects the height the claimant actually elevates his legs during a typical eight hour day.
>
> The claimant's symptoms were considered to the extent documented in the medical records and covered in his sedentary residual functional capacity with postural limitations, foot control limitations, and use of a foot stool 3-6 inches high while seated.

(*Id.* at 26–27.) Substantial evidence supports the ALJ's determination.

The ALJ also thoroughly reviewed and considered Plaintiff's degenerative disc disease and back pain in formulating Plaintiff's RFC:

> The claimant had rather minimal back treatment, with one evaluation on 9/24/20 for low back pain with radiation into bilateral buttocks and numbness tingling into left thigh. He reported pain that was aggravated by walking, standing, lifting and bending and moderately lessened with rest and inactivity. He had only treated with a chiropractor. Lumbar x-rays were remarkable only for endplate spurring and mild convex deformity of the lumbar spine. He had normal findings on exam as far as full strength and range of motion throughout the lumbar spine, intact sensation, negative straight leg raises, normal skin, and only tenderness on the bilateral lower lumbar paraspinal muscles and sacroiliac joint areas (B3F, see also normal findings at his 12/4/20 exam B6F/8). January 13, 2020 imaging of the claimant's thoracic

> spine revealed mild discogenic changes without evidence of fracture or subluxation. The claimant had well preserved lumbar disc spaces with only mild endplate hypertrophic spurring on same day imaging (B2F/6-7). The record contains a letter dated 3/7/21 that revealed no further visits from pain management to date (B5F).
>
> However, on 3/12/21, the claimant was seen by primary care advanced nurse practitioner with back pain complaints without radiation to the legs. This provider noted the claimant's history of recurrent self-limited episodes of low back pain in the past. The pain was described as dull, stabbing and throbbing without urinary or bowel incontinence or saddle paresthesia. He stated that his exacerbating factors are bending backwards, bending forwards, bending sideways, sitting, standing and walking. His treatments to date included Ibuprofen, a muscle relaxant, and Norco (for exacerbations), all that admittedly helped his symptoms. Here he received a trial of Flexeril and Diclofenac for lumbar degenerative disc disease (B6F/14). The claimant later requested a change of medications as he described improvement in the past with Zanaflex and Relafen and wanted to go back on those. His increased leg swelling was thought likely related to his Diclofenac, which was discontinued, and with his Lasix refilled. The claimant and his provider discussed weight reduction, diet and exercise (B8F/5). The claimant had spasms in the lumbar back at a follow-up, but his degenerative disc disease was deemed stable. He continued to do well with treatment (Id. at 11). His sedentary residual functional capacity with overhead reaching, posturals, and hazard limitations cover supported deficits.

(*Id.* at 28.) On May 7, 2021, plaintiff was seen for follow up for back pain, and the note from that visit states, "back pain stable, continue current regimen." (R. 426.) Plaintiff was again seen on June 18, 2021, and reported that "Relafen and Zanaflex are helping with back pain" and he "[w]ould like to continue these." (R. 428.) The foregoing demonstrates that the ALJ's determinations that Plaintiff's degenerative disc disease was stable and that Plaintiff responded well to treatment are amply supported by substantial evidence.

In summary, based upon a full review of the ALJ's decision and the record, the Court finds that the ALJ did not err in her determination of Plaintiff's RFC. With regard to the application of SSR 16-3p, the ALJ gave specific reasons for the weight she afforded to Plaintiff's symptoms. Those reasons were consistent with and supported by substantial record evidence and were articulated sufficiently to allow a reviewer to assess how the ALJ reviewed Plaintiff's symptoms. That is all that SSR 16-3p requires. The ALJ also properly took into consideration the

17

combined effects of Plaintiff's impairments in determining Plaintiff's RFC as sedentary with additional limitations. Plaintiff's migraines were taken into consideration with noise and hazard limitations in his RFC. (*Id.* at 27.) Plaintiff's psychological limitations were addressed by the RFC's reduction to semi-skilled work, only occasional changes in a static work environment, and only occasional interaction with supervisors, co-workers or the general public. (*Id.* at 31.) The ALJ expressly stated that "[t]he combined effect of the claimant's impairments plus the aggravating factor of his very high body mass indexes in the upper 70s kg/m2 warrant a reduction to sedentary exertional level with climbing limits, postural limits, foot control limits, upper extremity limitations, noise and hazard limits recognizing the need for the use of a foot stool 3-6 inches high while seated." (*Id.* at 29.) Substantial evidence supports the ALJ's RFC determination.

Because substantial evidence supports that ALJ's RFC determination, Plaintiff's second contention of error is not well taken.

## V.   DISPOSITION

In sum, from a review of the record as a whole, the Court concludes that substantial evidence supports the ALJ's decision denying benefits and that the ALJ's decision was made pursuant to proper legal standards. For the foregoing reasons, the Plaintiff's Statement of Specific Errors is **OVERRULED** and the Commissioner of Social Security's decision is **AFFIRMED**.


  **IT IS SO ORDERED.**

/s/ *Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE